**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF FLORIDA**
**PENSACOLA DIVISION**


IN RE: 3M COMBAT ARMS EARPLUG   )   Case No. 3:19md2885
PRODUCTS LIABILITY LITIGATION,  )
                                )   Pensacola, Florida
                                )   March 14, 2024
In re:  RICKY DEAN KELLY        )   2:09 p.m.
        7:20cv36595             )
                                )
_____ )


MOTION TO WITHDRAW and STATUS


TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE M. CASEY RODGERS
UNITED STATES DISTRICT JUDGE

(Pages 1-23)


A P P E A R A N C E S


**FOR THE PLAINTIFFS:**    Aylstock, Witkin, Kreis & Overholtz, PLLC
                           By:  **BRYAN F. AYLSTOCK**
                                *baylstock@awkolaw.com*
                           17 E Main Street, Suite 200
                           Pensacola, Florida  32502

*Donna L. Boland, RPR, FCRR*
*Certified Court Reporter*
*1702 E Baars Street * Pensacola, Florida  32503*
**DLBolandUSCR@gmail.com**

1          P R O C E E D I N G S

2          **THE COURT:**  Good afternoon.  I apologize for the brief

3   delay.  We are here in Mr. Ricky Dean Kelly's 3M case.

4          Mr. Kelly, I am Judge Casey Rodgers.  I am the judge

5   who has had the privilege of presiding over the Combat Arms

6   Earplug MDL since assignment of that litigation to me in April

7   2019.

8          I have Mr. Aylstock, your present counsel, is here in

9   the courtroom with you.  There are some other attorneys,

10  Mr. Monsour, Mr. Bradford, Mr. Burns also in the courtroom.

11         The first part of this hearing relates to the motion

12  to withdraw that is pending before the Court.  So I need to

13  know from you before we proceed whether you are okay with these

14  other lawyers who are not members of Mr. Aylstock's firm being

15  present in the courtroom for this discussion.  3M, obviously,

16  is not present.

17         **MR. KELLY:**  That's okay, Your Honor.

18         **THE COURT:**  All right, very good.

19         So the Motion to Withdraw is pending.

20         Mr. Aylstock, it's your motion.  I certainly

21  understand the background and the context of it, but I'll let

22  you be heard.  And you're fine to remain seated or you can

23  stand, whatever you're more comfortable with.

24         **MR. AYLSTOCK:**  I think, out of force of habit, Your

25  Honor, I'll stand.

1      **THE COURT:**  That's what most lawyers say.

2      **MR. AYLSTOCK:**  Yes, Your Honor, we're at this point in

3  our relationship with Mr. Kelly, attorney/client relationship

4  with Mr. Kelly -- first of all, I very much like Mr. Kelly, and

5  he's been a very cooperative client all the way up and down.

6      However, as you know, my firm and others negotiated

7  this global class action settlement, and we believe very

8  strongly that it is a fair settlement, not just for the

9  whole -- and there are a lot, 250,000 participants in the

10  settlement -- but we believe that, particularly given the

11  ability of the settlement to take into account some

12  extraordinary things that might be present, and, in our view,

13  are present in Mr. Kelly's case, that his best interest, by

14  far, is to participate in this settlement.

15      We have made that clear, and Mr. Kelly has a different

16  view.  He can speak for himself on that.  But we've come to the

17  point where we believe that there is such a fundamental

18  disagreement as to the path forward for Mr. Kelly that, not

19  only do we think we should be able to withdraw, I think it's --

20  if we were to continue on toward litigation, that there would

21  be continued conflict about the path forward and the right path

22  forward for Mr. Kelly.

23      There is some law on this with regard to that, and

24  there's certainly -- we understand our ethical obligations, our

25  duty to the Court, but also our duty to everybody pursuant to

1    the Florida Bar rules.  And we would submit that, under Florida

2    Bar rule 4.16 subsection B, and, in particular, subsection

3    (b)(2), that, in our view, Mr. Kelly is insisting on a course

4    of action that, while we don't consider it repugnant, we do

5    consider it imprudent.  And it is certainly a course of action

6    which we believe, as his current lawyer, we have a fundamental

7    disagreement as to whether to proceed in litigation and not

8    participate in the settlement, and in particular, with the

9    ability to apply for the extraordinary injury fund.  You'll

10   hear from Mr. Kelly, I'm sure, but we would certainly be

11   submitting an extraordinary injury fund for him.

12           We understand the Court's deadlines under CMO 57, and

13   we've been working diligently with Mr. Kelly for him to comply

14   with all of those deadlines, including the upcoming expert

15   report deadline.  We've also made it clear to Mr. Kelly that,

16   regardless if Your Honor lets us withdraw or not, we're going

17   to proceed and represent him zealously until and unless that

18   happens, we will be continuing for him to prosecute his claim

19   with 3M.

20           And furthermore, we have also made clear that we're,

21   at this point, not seeking a fee for his case, regardless of

22   Your Honor's ruling in this matter.  We really do want

23   Mr. Kelly to get everything that he deserves through the $6.01

24   billion that 3M has put in total in the 3M SAs.  We think

25   that's clearly the best course of action for Mr. Kelly.

1        **THE COURT:**  All right.  Thank you, Mr. Aylstock.

2            Mr. Kelly, would you like to be heard?

3        **MR. KELLY:**  Yes, Your Honor.  I'm not very good at --

4    could I come up to the stand?

5        **THE COURT:**  You can come up to the lectern, if you'd

6    like, sure.

7        **MR. KELLY:**  I'm not an attorney.  Didn't think I was

8    ever going to have to do this.

9        **THE COURT:**  Well, just take your time.

10       **MR. KELLY:**  We're here for the withdrawal of counsel

11   of record.  And from what I can understand, there's -- he's

12   listed one reason for withdrawing, which is fundamental

13   disagreement.

14           I'd like to disagree on that point because, other than

15   a fundamental disagreement, there really haven't had a

16   disagreement, other than the fact that I will not take the

17   settlement.

18           And I brought some -- I actually brought some cases

19   that's been heard on -- one of them is *McDaniel vs. Daiichi*, a

20   2000 lawsuit filed in MDL.  It was the olmesartan family of

21   medications.

22           Approximately two years into the MDL, parties

23   negotiated a detailed voluntary settlement program into which

24   each plaintiff was required to opt in in order to participate,

25   which is the same as this case.

1           When plaintiff, McDaniel, refused to opt in, one of

2    the five plaintiffs to do so, plaintiff's counsel filed a

3    motion to withdraw from representation.  Counsel argued that

4    the settlement was in McDaniel's best interest.  The withdrawal

5    would not have a materially adverse effect on McDaniel because

6    trial had not yet been set or discovery completed, and that, to

7    continue the representation would oppressively be expensive for

8    counsel.

9           The New Jersey district court -- federal court denied

10   the motion citing three reasons.  First, the fact that

11   McDaniel's retainer agreement permitted counsel's withdrawal

12   was immaterial because the agreement did not supercede

13   counsel's obligation under the rules of professional conduct.

14          Second, the Court found withdrawal could materially

15   prejudice McDaniel because it was unlikely he could retain new

16   counsel even if the matter was not at the eve of trial.

17   McDaniel's status as one of only five plaintiffs to refuse the

18   settlement in tandem with the high expense associated with

19   trying the case rendered it almost certain in the court's eyes

20   that he would not be able to find substitute counsel.

21          And that's true, in my case, Your Honor.  I've had

22   over 100 phone calls to different law firms across the country.

23   Nobody is interested.  As a matter of fact, most of them has

24   already been involved in this litigation and the settlement

25   agreement forbids them to take on any new clients, which is

1    another problem.

2              And also, the Court noted it would take replacement

3    counsel a significant amount of time to become familiar with

4    the case in light of the complex product liability theory, that

5    that's the same reason that McDaniel could not reasonably be

6    expected to proceed *pro se*.

7              And same thing in my case.  I'm not an attorney and,

8    you know, I've just done a little research is all I've done.

9              And I'd like to say that I'm very happy with my

10   representation with Mr. Aylstock, and I think he's a great

11   attorney, and that's the reason I picked him.  I actually done

12   some research, and I was happy with him.

13             But what I can see is the only reason is because I

14   didn't settle.  And I'm going to read something about that,

15   too, if you don't mind, ma'am.

16             **THE COURT:**  Read something, I'm sorry, about?

17             **MR. KELLY:**  About that -- on this particular case,

18   finally, the financial burden on counsel to try McDaniel's case

19   was not grounds for withdrawal.  The court stressed that the

20   fact that it would be expensive to litigate this case is not a

21   surprise to counsel.  If counsel is now scared off by the

22   prospect for paying for trial, counsel should have not

23   undertaken the representation of plaintiff in the first

24   instance.

25             Finally, the decision of New Jersey's court decision

1    established that plaintiff's counsel will not be able to escape

2    the representation simply because the plaintiff refuses to opt

3    into the negotiated settlement programs.

4         The high cost associated with taking a product

5    liability claim to trial are not only insufficient to warrant

6    withdrawal but actually weigh against permitting counsel to

7    escape representation.

8         And the actual settlement agreement that -- there's

9    two terms that I feel like it runs into ethic problems is the

10   mandatory recommendation provision is inconsistent with the

11   larger duty to give independent and loyal advice to clients.

12   The mandatory withdrawal provision violates the bar on practice

13   restrictions.  The constraints on terminating the lawyer/client

14   privileges and the principle that the decision to accept or

15   reject a settlement belongs to the client.

16        And a particular case was the Vioxx settlement, which

17   is pretty much the same thing as the earplug case.  The

18   mandatory recommendation and mandatory withdrawal provisions in

19   the Vioxx settlement ran afoul of several legal ethic rules, as

20   the number of commentators, including myself, pointed out.

21        **THE COURT:**  Were you in that litigation?

22        **MR. KELLY:**  No, ma'am.

23        **THE COURT:**  How did you come to comment on that?

24        **MR. KELLY:**  I found it researching information Fordham

25   Law Review.

1    **THE COURT:**  So you commented to who about the Vioxx

2    settlement?

3    **MR. KELLY:**  To you, ma'am.  Like I had pointed out, I

4    think it's -- the mandatory withdrawal provision I think is not

5    legally ethical.

6    **THE COURT:**  Okay.  So you're making that argument to

7    me.  You did not make that argument in Vioxx?

8    **MR. KELLY:**  No, ma'am.  I'm sorry, if I --

9    **THE COURT:**  No, I may have just misunderstood you.

10   That's fine.

11   **MR. KELLY:**  The most fundamental point is that the

12   decision to settle belongs to the client, not the client's

13   lawyer.  That's from the Model Rules of Professional Conduct.

14   The mandatory recommendation provision runs afoul of

15   the lawyer's obligation to give clients independent and loyal

16   advice.  A lawyer must base her advice on what she thinks is

17   right for the client, not what she promised another party,

18   particularly the adversary, that she will tell her client.

19   Several ethics rules come into play.  Rule 1.4 on

20   communication with clients requires lawyers to explain matters

21   as reasonably necessary so that the clients can make informed

22   decisions.  Lawyers are required to exercise independent,

23   professional judgment and render candid advice.  Finally, the

24   conflict of interest rules prohibit representation absent -- if

25   there is a significant risk that the lawyer's duty to a third

1    person will materially limit the advice that the lawyer gives

2    to her client.  It is difficult to see how a lawyer could

3    comply with these obligations while agreeing to recommend the

4    settlement to every one of her clients.

5         **THE COURT:**  Let me ask, in those two cases you cite,

6    the New Jersey MDL and the Louisiana MDL, do you know if the

7    attorneys who were seeking to withdraw in those two instances

8    were lead counsel in those MDLs?

9         **MR. KELLY:**  Your Honor, I don't -- I -- I didn't -- I

10   didn't pick it up.  I wasn't actually looking for that.  It may

11   be --

12        **THE COURT:**  I ask because you have had the benefit in

13   your case of having counsel who has really unsurpassed -- I

14   mean, no other counsel in this litigation has the experience

15   and knowledge, breadth of knowledge and experience that

16   Mr. Aylstock does as far as the claims and defenses and the

17   difficulties of litigating the MDL.

18        So, I don't know, again, where those lawyers are or

19   where they were in those MDLs, whether they were a part of

20   leadership, whether they were lead counsel or part of

21   leadership, or whether they were on the sidelines having ever

22   -- I don't know if they filed a case.

23        In many of those MDLs, some cases are never filed.

24   Or, if they had filed a case, if they were, again, on the

25   sidelines just sitting and waiting to see if a settlement

1    occurred, as opposed to a lawyer like a Mr. Aylstock who was

2    lead counsel over the entire MDL as well as a lawyer with

3    leadership responsibilities throughout numerous bellwether

4    trials.  So he has a different vantage point, if you will, than

5    maybe those two lawyers.

6            I'm not saying this makes a difference.  I'm not aware

7    of these two cases.  I'll certainly consider them.  I'll give

8    Mr. Aylstock an opportunity to respond, if he wishes to.  But

9    that is an observation that I would make, and that's why I

10   asked the question.

11           **MR. KELLY:**  I'm sorry, I don't have the answer, Your

12   Honor.

13           **THE COURT:**  Well, when I read the cases, I'll probably

14   be able to figure it out.

15           **MR. KELLY:**  Finally, the conflict of interest rules

16   prohibit representation absent consent if there is a

17   significant risk that the lawyer's duty to a third person will

18   materially limit the advice that the lawyer gives to her

19   client.  It's difficult to see how a lawyer could comply with

20   these obligations while agreeing to recommend a settlement to

21   every one of her clients.

22           **THE COURT:**  Are you reading from the order?  Is that

23   -- or is this your --

24           **MR. KELLY:**  Yeah.

25           **THE COURT:**  I couldn't if you were still reading the

1    orders.

2         **MR. KELLY:**  Yeah, I'm still reading, but I have notes,

3    too, that I've got on the side.

4         **THE COURT:**  That's all right.

5         **MR. KELLY:**  The mandatory withdrawal provision

6    presents several ethical problems.  In addition to undermining

7    the client's decision of whether to settle, mandatory

8    withdrawal violates the prohibition on settlement provisions

9    that restrict a lawyer's right to practice, as well as the

10   constraints on termination of the lawyer/client relationship.

11        Rule 5.6(b) prohibits settlement provisions that

12   restrict a lawyer's right to practice.

13        A lawyer shall not participate in offering or making

14   an agreement in which a restriction on the lawyer's right to

15   practice is part of the settlement or a client controversy.

16        An American Bar Association formal ethics opinion

17   addressed the rules' applicability to mass torts in light of

18   the pressure to find creative solutions to mass tort

19   litigation.  It concluded that a lawyer cannot agree to refrain

20   from representing present or future clients against a defendant

21   pursuant to a settlement agreement on behalf of current clients

22   even in the mass tort global settlement context.

23        In another case, a federal court held that the

24   plaintiff's lawyers violate Rule 5.6 because they negotiated a

25   settlement for 56 plaintiffs and coerced at least one

1    plaintiff, if not many more, to accept the settlement by

2    threatening to withdraw if the settlement was not accepted.

3              I'm sorry this is long but --

4              Material -- if my attorney withdrawals, the material

5    adverse effects on my case is several.  And one of them is --

6    one of them is the distance to the Court.  It's a long way from

7    Wilmington, North Carolina, to here.  And the case is old

8    already, and it's already been in court four or five years, and

9    there's no attorney --

10              I'll just read it to you, it's better to put it this

11    way.  No material adverse effects on the interest of the client

12    in the Vioxx case.  A client's search for replacement counsel

13    would be complicated by the fact that nearly every Vioxx

14    plaintiff lawyer participated in the settlement, thus agreed to

15    get out of the business of Vioxx litigation.

16              It's hard to imagine under these circumstances a

17    straight-faced argument that withdrawal would not adversely

18    affect my claim.  Even if termination would have a material

19    adverse effect, Rule 1.6(b) permits withdrawal for a number of

20    reasons.  They include a client insists upon taking action with

21    which the lawyer has a fundamental disagreement, the

22    representation will result in an unreasonable financial burden

23    on the lawyer or has been rendered unreasonably difficult by

24    the client, and other calls for withdrawal exist according to

25    1.16(b).

1           A lawyer withdrawing from a nonsettling client must

2     seek to justify the withdrawal under 1.16(b)(4) on the grounds

3     that the lawyer fundamentally disagrees with the client's

4     decision to reject the settlement.

5           In a similar vein, the lawyer might contend that the

6     lawyer, by refusing to cooperate with the settlement, has

7     rendered the representation unreasonably difficult within the

8     meaning of Rule 1.16(b)(6).

9           The problem with both of these arguments is that they

10    assume the settlement decision belongs to the lawyer despite

11    1.2(a)'s clear instruction that the lawyer shall abide by the

12    client's decision whether to accept or reject a settlement.

13         **THE COURT:**  Mr. Kelly, let me ask you this.  So, if I

14    deny Mr. Aylstock's Motion to Withdraw and I require him to

15    continue representing you, and let's just say the case proceeds

16    and we're, I don't know, two years from now, which it sounds to

17    me that would be probably reasonable in terms of looking at

18    when you might get a trial somewhere.  So two years from now

19    Mr. Aylstock decides, based upon the evidence in your case that

20    he's aware of, that you don't have a good case, that you are

21    going to lose either before the judge or ultimately lose before

22    a jury.

23         Are you suggesting that Mr. Aylstock could not

24    withdraw at that point?

25         **MR. KELLY:**  No.  I'm suggesting that my lawyer should

1    have performed the due diligence of researching --

2             **THE COURT:**  What due diligence?

3             **MR. KELLY:**  To research my case before he accepts my

4    case.

5             **THE COURT:**  Well, Mr. -- that would have been

6    impossible in this litigation.  In fact, the statutes of

7    limitation would have run for most everyone because all of --

8    99 percent of the discovery or the relevant factual information

9    was with the Department of Defense and the Department of

10   Veterans Affairs.

11            And if you're a veteran, like I am, you know how

12   difficult it is for you individually to obtain that

13   information.  And I'm not sure any lawyer could have gotten all

14   of your relevant audiograms and VA records in time to file a

15   lawsuit within the statute of limitation.

16            **MR. KELLY:**  Your Honor, I had everything in my

17   possession.

18            **THE COURT:**  Well, I don't know if that's true or not

19   true.  I'm not questioning you.  But that certainly wasn't the

20   case for a lot of -- the thousands and thousands of plaintiffs

21   in this litigation.  I don't know if you had everything or not.

22   But we're going to talk a little bit more later about the

23   records you do have or that I'm aware of.

24            Do you have anything else, Mr. Kelly, on this issue of

25   Motion to Withdraw?

1    **MR. KELLY:**  No, ma'am.  That's all.

2    **THE COURT:**  Do you have -- or maybe you can ask

3   Mr. Aylstock for his help.  I just would like the citations for

4   the two cases that Mr. Kelly cites, the New Jersey case and the

5   Vioxx order that he cites, if anybody has those.

6    **MR. KELLY:**  Thank you, Your Honor.

7    **THE COURT:**  Thank you, Mr. Kelly.

8    Mr. Kelly, do you have copies?  I don't want to take

9   your only copies.

10    **MR. KELLY:**  I've got -- I only have this one copy, and

11   I've got all my notes.  You can make copies of it.

12    **THE COURT:**  Let me see if -- since Mr. Aylstock is

13   still representing you at this very moment, let me ask him to

14   see what you have there -- he won't take it from you

15   permanently, but maybe he can give me a citation where I can

16   just find this myself, these two orders.

17    **MR. AYLSTOCK:**  Your Honor, the *McDaniel* case is

18   *McDaniel vs. Daiichi Sankyo*, et al.  I don't see a case cite,

19   but I can certainly pull that and provide it to Your Honor.

20   The publication is -- looks like something off the internet.

21    **THE COURT:**  This is the District of New Jersey?

22    **MR. AYLSTOCK:**  The District of New Jersey case.

23    **THE COURT:**  So it's not a case cite, it's a quote from

24   an order?

25    **MR. AYLSTOCK:**  Correct.  This is a November 20th,

1    2018, article written by Faegre Drinker on products.

2         **THE COURT:**  Mr. Aylstock, I'm going to ask you, as an

3    officer of the Court and as a representative of Mr. Kelly at

4    this time, to see what you can do to find that order and

5    provide that to the Court.  My law clerks will research it as

6    well, but if you can see if you can find it.  I'd like the

7    actual order, not an article that talks about it.

8         **MR. AYLSTOCK:**  We'll find it, Judge.

9         The other one, this should have a cite.  It looks like

10   Cornell Law Review, volume 96:265.

11        **THE COURT:**  The law review should cite the order, at

12   least the litigation.

13        **MR. AYLSTOCK:**  Yeah, this is the law review article

14   that's citing the *Vioxx*.

15        **THE COURT:**  Does it cite the actual order?

16        **MR. AYLSTOCK:**  I don't see a case cite.

17        **MR. KELLY:**  It cites some of the rulings, I think.

18        **MR. AYLSTOCK:**  Well, there's *Di Flumeri vs. Le Shack*,

19   *[phonetic]*, which is 2000 Westlaw 654608.  That's a Northern

20   District of New York, May 19th, 2000, case, and it's also

21   talking about the *Vioxx* litigation.

22        **MR. KELLY:**  There may be more listed.

23        **MR. AYLSTOCK:**  And I'm happy to pull this whole --

24        **THE COURT:**  I just want to make sure that I -- as

25   authoritative as the Cornell Law Review is, that would not be

1  persuasive authority for me if it's the commentary of a law

2  professor.  I'm interested if it's Judge Fallon's language, or

3  some other MDL judge's language in an order, then I certainly

4  would be interested in that.  I'm not interested in what law

5  professors think about motions to withdraw.

6          **MR. AYLSTOCK:**  Understood, Judge.  But we'll be happy

7  to pull them and provide them to the Court.

8          **THE COURT:**  Do you have any response you'd like to

9  present, Mr. Aylstock?

10         **MR. AYLSTOCK:**  Yes, Your Honor, briefly.  I would cite

11 the Court to the *Fisher vs. State* case, Supreme Court of

12 Florida, 248 So.2d 479, and in particular at page 486, where

13 the Florida Supreme Court says:  "We hold that, in a civil

14 case, any attorney of record has the right to terminate the

15 attorney/client relationship and to withdraw as an attorney of

16 record upon due notice to his client and approval by the Court.

17 Approval by the Court should be rarely withheld, and then only

18 upon a determination that to grant said request would interfere

19 with the efficient and proper functioning of the Court."

20         A couple of other points.  I certainly am well aware

21 of the provisions of the Master Settlement Agreement, having

22 negotiated those provisions, and I'm well aware of the

23 provision with regard to recommending this to 100 percent of

24 our clients.

25         I negotiated this in conjunction with some others.

1   But upon signing this, knowing that what we had achieved in the

2   face of a bankruptcy attempt and many other things, was many,

3   many times more than what 3M would have achieved potentially if

4   the bankruptcy had -- or Aearo's bankruptcy had succeeded.

5        But also, one of the other provisions that I

6   personally fought hard for -- and 3M is aware of this -- is

7   Section 17.17 in the MSA, which says that, "Nothing in this MSA

8   shall be interpreted to require any party, any eligible

9   claimant, or CAE counsel or defendants to engage in any conduct

10  that is in violation of law and/or unethical under the

11  applicable ethical rules."

12       I am well aware of 4-1.16 and when withdrawal is

13  allowed.  I am also acutely aware, because of my history in

14  doing mass torts, of the potential for conflict amongst our own

15  clients.  And in fact, our contingency fee agreement with

16  Mr. Kelly actually has a waiver of that conflict, in that, "The

17  client understands that the firm represents more than one

18  client alleging injury related to the use of the 3M Combat Arms

19  Earplugs, and the client understands that the firm will make

20  decisions which, in its judgment, best serve the interests of

21  all of the firm's 3M Combat Arms clients.  It is possible that

22  a conflict will arise between what's in the best interest of

23  the group or the firm's clients as a whole and the interest of

24  the individual client.  Despite this possible conflict, client

25  desires to hire the firm and represent client's interest, and

1    client waives any conflict of interest resulting from the

2    firm's representations of multiple 3M Combat Arms clients."

3         It say this, but I do want to make this very important

4    point.  In light of 17.7 in the MSA and in light of everything,

5    I want to assure Mr. Kelly and the Court that, despite all of

6    that, my firm have 100 percent gone through and individually

7    evaluated his case under the settlement.  If, in fact, I did

8    not believe that the settlement was in Mr. Kelly's best

9    interest, I believed, because I negotiated that provision, that

10   I could absolutely give him advice to continue to litigate, and

11   I would actually do that.

12        This is not a case like some of the others and I think

13   probably that New Jersey case where it's a matter of I don't

14   want to spend the money or my firm doesn't want to spend the

15   money.  I fundamentally believe that, through the EIF process

16   and with some of the unique factors that I believe Mr. Kelly

17   has, that we can achieve and would achieve a fair settlement

18   for him in the settlement program that was negotiated.

19        I believe that in the court system that that's not in

20   Mr. Kelly's best interest to continue forward.  If it was, we

21   would do that.  And we're -- if the Court decides that we

22   remain, we will do that to the best of our ability, and we'll

23   spend whatever resources and money is necessary.  But it's not

24   a matter of the financial burden on us.  It is a matter of what

25   we believe is improvident action to move forward as part of a

1    litigating plaintiff as opposed to participating in the

2    settlement and availing Mr. Kelly of every available

3    opportunity both under the various programs of deferred payment

4    program perhaps but especially the extraordinary injury as to

5    why we're providing that advice to him.

6            And that's the reason that we're withdrawing, not

7    because of any provision that somebody might say would require

8    us to simply withdraw.

9            **THE COURT:**  All right.  I appreciate that from both of

10   you.

11           I'd like to see your fee contract or your --

12           **MR. KELLY:**  Can I say something, Your Honor?

13           **THE COURT:**  I'm sorry?

14           **MR. KELLY:**  Can I say something?

15           **THE COURT:**  Okay.

16           **MR. KELLY:**  I already spoke on that, I won't be able

17   to get an attorney.  So, if I continue my case, which I

18   probably will, I'm going to have to be *pro se*, and I'm going to

19   be at a very big disadvantage going forward.

20           And I don't know if we're allowed to talk about what

21   the settlement amounts have been offered to me --

22           **THE COURT:**  Actually, once this hearing is over, we're

23   going to move into a different phase of this hearing, and it's

24   going to be more about the challenges of you going forward,

25   although I'm not going to spend a ton of time on that because I

1    think you have your eyes pretty wide open as far as that's

2    concerned.  But also we'll talk a little bit more about the

3    settlement.

4              So it's not that you're prohibited from doing so right

5    now.  I just -- we're going to get there in just a minute, if

6    you're okay to wait for a few minutes.

7              **MR. KELLY:**  Yeah.

8              **THE COURT:**  We'll get there.

9              **MR. AYLSTOCK:**  May I approach, Your Honor?

10             **THE COURT:**  Yes.

11             I'm going to take the Motion to Withdraw under

12   advisement.  I'd like to look at the cases that Mr. Kelly

13   argued to the Court.  I'm not familiar with them, and so I'm

14   going to search and try to find those orders.

15             Mr. Aylstock, if you do find them, please share them

16   with the Court and with Mr. Kelly, the full orders.

17             **MR. AYLSTOCK:**  Yes, Your Honor.

18             **THE COURT:**  And then I will issue a ruling, most

19   likely in writing, as soon as I can.

20             But in the meantime, Mr. Aylstock, your firm will be

21   required to continue to represent Mr. Kelly, in the meantime,

22   until I rule.

23             **MR. AYLSTOCK:**  Understood, Your Honor.

24             **THE COURT:**  One way or the other.

25             So, Mr. Kelly, I'll issue an order.  It will either

1    grant the motion, which would then allow the firm to withdraw,

2    or it will deny it, which, of course, would require them to

3    continue to represent you.

4            And I have no doubt -- I know this law firm, know the

5    law firm well through lots of litigation in front of this

6    Court -- that if they are required to continue to represent

7    you, I know they will do that vigorously and --

8            **MR. KELLY:**  I'm confident, Your Honor.

9            **THE COURT:**  Okay.  But no guarantees.  I need to look

10   into this and then issue a ruling that I feel is supported by

11   the ethical rules and my discretion as well as any law that's

12   out there that might be persuasive.

13           **MR. KELLY:**  Thank you, Your Honor.

14

15                *(Proceedings concluded at 2:44 p.m.)*

16                   --------------------

17   *I certify that the foregoing is a correct transcript from the*
     *record of proceedings in the above-entitled matter.  Any*
18   *redaction of personal data identifiers pursuant to the Judicial*
     *Conference Policy on Privacy are noted within the transcript.*
19

20   *s/Donna L. Boland                              5-15-2024*
21   *Donna L. Boland, RPR, FCRR                     Date*
     *Official Court Reporter*
22

23

24

25