**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF FLORIDA**
**PENSACOLA DIVISION**


IN RE: 3M COMBAT ARMS EARPLUG    )    Case No. 3:19md2885
PRODUCTS LIABILITY LITIGATION,   )
                                 )    Pensacola, Florida
                                 )    March 14, 2024
In re:  RICKY DEAN KELLY         )    2:44 p.m.
        7:20cv36595              )
                                 )
_____ )


STATUS CONFERENCE


TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE M. CASEY RODGERS
UNITED STATES DISTRICT JUDGE

(Pages 1-34)


A P P E A R A N C E S


**FOR THE PLAINTIFFS:**     Aylstock, Witkin, Kreis & Overholtz, PLLC
                            By:  **BRYAN F. AYLSTOCK**
                                 *baylstock@awkolaw.com*
                            17 E Main Street, Suite 200
                            Pensacola, Florida  32502

                            Moore, Hill & Westmoreland, PA
                            By:  **CHARLES F. BEALL, JR.**
                                 *cbeall@mhw-law.com*
                            350 W Cedar Street, Suite 100
                            Pensacola, Florida  32502


*Donna L. Boland, RPR, FCRR*
*Certified Court Reporter*
*1702 E Baars Street * Pensacola, Florida  32503*
**DLBolandUSCR@gmail.com**

1                    P R O C E E D I N G S

2          **THE COURT:**  Okay.  So the next thing I want to do is

3    talk to you, Mr. Kelly, about how your case is going to proceed

4    going forward, whether you're represented by counsel or you're

5    not.

6          **MR. AYLSTOCK:**  Should I get Mr. Beall?

7          **THE COURT:**  Yeah, I was just about to say, but I'm

8    going to bring in -- thank you, Mr. Burns.  3M's lawyer is

9    going to be a part of this, and has been for other conferences

10   of this nature.

11         Hello, Mr. Beall.  Come on in.

12          *(Mr. Beall present.)*

13         Mr. Kelly, this is Mr. Charles Beall.  Mr. Beall is

14   with a law firm here in town, and he represents 3M.  He is one

15   of many lawyers who represents 3M, but he is the local.

16         So, Mr. Kelly, I've been conducting these conferences

17   with plaintiffs who have elected to opt out of the settlement,

18   and you're not the only one.  There's not a large number --

19   I'll talk about that in just a moment -- but I have been

20   holding these conferences, and two reasons for that.  And these

21   were -- this was something I contemplated doing way back in

22   August when the settlement was reached.

23         The first reason for holding these conferences with

24   opt-out plaintiffs was to talk with plaintiffs -- I wanted to

25   to talk with plaintiffs about the extraordinary nature of the

1    litigation, everything that had gone into the MDL, which was,

2    again, extraordinary.

3            And your situation, though, is a little different,

4    because in the other conferences I've had, whether they were

5    *pro se* plaintiffs or they were represented plaintiffs, those

6    individuals were not on the front lines of the litigation as

7    your counsel has been.

8            And so these were people who were, as I said earlier,

9    truly on the sidelines and had not had sort of a front seat to

10   the litigation day in and day out, understanding the strain of

11   it and experiencing the strain and the toll of it.

12           But regardless, even though Mr. Aylstock is familiar

13   with the strain and the toll and everything I've been saying to

14   other opt-out litigants, I want you to hear this from me,

15   because you have not been here day in and day out in the

16   litigation.

17           And frankly, I thought it would be important for

18   opt-out plaintiffs to hear from me personally as someone who

19   was very experienced and knowledgeable about the litigation,

20   but also I'm the only neutral person in this courtroom.  These

21   people aren't neutral, you're not neutral, and, of course, 3M

22   is not neutral.  But I am.  And I have had a front row seat to

23   the litigation.

24           I also felt that it would be important at this

25   juncture for opt-out plaintiffs to have one last opportunity to

1      decide to take the settlement, to get into the program and, you

2      know, take the benefit of the settlement before the final

3      settlement registration deadline of the 25th of March.

4              So I thought it would be helpful for people like you

5      maybe who are *pro se* or don't have a lawyer who is as

6      knowledgeable about the litigation as Mr. Aylstock but to be

7      able to meet with leadership.

8              So we've been having these conferences, and

9      Mr. Aylstock has been at some of them, and Mr. Bradford and Mr.

10     Burns have been at some of them, to meet with opt-out

11     plaintiffs and/or their attorneys, and Mr. Beall as well, but

12     mainly on the plaintiffs' side, leadership, to discuss what the

13     litigation has been like and also to discuss the nuances of the

14     settlement program.

15             Some people in your shoes are really not very well

16     educated or versed in the settlement program.  There are things

17     about it, questions that they have, aspects of it that they're

18     not fully aware of.  Even some of the lawyers may not have

19     taken advantage of as many opportunities as there have been to

20     learn about the settlement program.

21             And so this also is an opportunity for someone like

22     you to meet with leadership but also to meet with Magistrate

23     Judge Cannon.

24             Hope Cannon is a judge who, like me, is assigned to

25     this litigation.  She's a judge on this Court.  And although

1     Judge Cannon was not involved in the trenches as I was

2     throughout the MDL, she was very involved in the trenches in

3     the settlement and in negotiating the settlement.

4              And so, again, helpful for people in your shoes

5     perhaps to have an opportunity to talk to her about the

6     settlement program as well.

7              Being here, as you mentioned, is a huge commitment on

8     your part, and I promise you I don't fail to recognize that.  I

9     do recognize it.  I appreciate you making the commitment.  The

10    Outer Banks of North Carolina is a long haul.  I know it

11    because I've driven it.  But this was necessary.  We couldn't

12    do this, in my view, as effectively via Zoom.

13             It gives me an opportunity to meet you, you an

14    opportunity to meet me.  If you go forward in your litigation,

15    you're going to get to know me better.  But this is sort of the

16    start of that, if your litigation does go forward.

17             And also, it's a good time for particularly a *pro se*

18    plaintiff to realize that being in court with the judge in

19    person is part and parcel of litigating.  That's part of --

20    even if you have counsel, it can be part and parcel of

21    litigating.  And certainly you may have to come back.

22             If you're *pro se*, you'll, I'm sure, have to come back.

23    If you are represented by Mr. Aylstock, he can appear at times

24    for you, but there may be times where you have to come back in

25    person.  That's just part of litigation.

1          So the litigation, as I said, was extraordinary.  I

2     don't want to take you through all those trials, and I don't

3     literally mean all the bellwether trials, although that's part

4     of the extraordinary nature of the litigation.  But there were

5     trials and tribulations as part of this litigation that really

6     did render it extraordinary, not the least of which was the

7     size of it.

8          At one point we had over 300,000 plaintiffs in this

9     litigation, which, by far -- and if you're versed in MDLs, then

10    you know by far surpasses any other MDL in the history of the

11    judiciary.  And at many times throughout the life of the

12    litigation, including today, this MDL occupies a third, a total

13    one-third of the entire federal judiciary's civil docket.  So

14    it is extraordinary in that sense.  And because of that, it's

15    been a strain on not just this Court but a strain on the

16    judiciary as a whole.

17         In one of my orders I wrote at the time in

18    contemplating remands of cases that, if I had -- when I could

19    have done it with the stroke of a -- or a keystroke -- I was

20    going to say a pen but I guess we don't do it with pens anymore

21    -- a keystroke remanded cases to the transferor districts,

22    would have been, on average, 2500 cases per 94 districts.  You

23    can do the math and that will tell you what number we were up

24    to at that point.  But that's what it would have been on

25    average.

1       And the burden of that on districts throughout the

2   country that are already overwhelmed would have been

3   extraordinary in and of itself.

4       And so, for that reason, I felt it was important back

5   at the time, again, of the settlement, because no one knew -- I

6   mean, we don't have a crystal ball, so no one knew whether this

7   program would be successful or not in terms of participation.

8   We didn't know.  We certainly hoped it would be.  The parties

9   hoped it would be, I hoped it would be.  But no one knew.

10       So, at that time, I'm thinking to myself I may have to

11   remand thousands and thousands and thousands of cases if people

12   don't participate.  And because of that, I put into place what

13   you now know as CMO 57, because I was not going -- and I'm

14   still not -- going to burden my colleagues around the country

15   with these cases that I know so much about.

16       And you can say, well, you don't know much about my

17   individual case.  And I grant you that.  But I do know a lot

18   about the claims that are raised by you and have been raised by

19   others.  I know a lot about the evidence, which is very similar

20   in terms of -- certainly in terms of liability and even

21   causation in some respects.  I know a lot about that.  I know a

22   lot about the defenses.

23       And because of that, I felt that, for cases to go

24   forward, they were going to have to be real, viable cases that

25   were not going to just go clog up other courts' dockets, they

1    were going to be real cases ready for trial.  And so that's why

2    CMO 57 was put into place.

3              And some people may argue CMO 57 has a lot of hurdles.

4    And I wouldn't argue against that.  Some may argue that it's

5    unfair.  CMO 57 is not an order that I enter in every single

6    civil case on my docket by any means.  But there's nothing

7    ordinary about this litigation, and so that's why I felt it was

8    necessary.

9              And it may be that some whose cases end up being

10   dismissed because they are unable or do not comply with CMO 57,

11   that they appeal my decision to dismiss their case to the

12   Eleventh Circuit.  That may happen.  And they may argue to

13   those judges on that court that this is unfair, it's overly

14   burdensome, shouldn't have been done.  And we'll just have to

15   wait and see what those judges think about my decision on how

16   to deal with this very extraordinary, challenging, and

17   unprecedented litigation.

18             So, CMO 57, again, you're aware of it.  You've been

19   mostly compliant with it.  I know Mr. Aylstock has assisted --

20   or I believe he's assisted you with that because you've been

21   compliant, for the most part.

22             Mr. Aylstock, you have assisted Mr. Kelly in complying

23   with CMO 57?

24             **MR. AYLSTOCK:**  *(Indicating affirmatively.)*

25             **THE COURT:**  There are numerous deadlines, many of them

1    are 30-day deadlines right off the bat.

2         Mr. Beall, have you all issued a deficiency?  I think

3    you have.

4         **MR. BEALL:**  We did on March 8th.  It is shorter than

5    some of the other ones, but there are a handful that -- we sent

6    it to Mr. Aylstock through MDL Centrality.

7         **THE COURT:**  Okay.  So, do you know what I'm talking

8    about, Mr. Kelly, the deficiency letter?  Do you know what I'm

9    referring to?

10        **MR. KELLY:**  Short -- CMO 57 short information or

11   something?

12        **THE COURT:**  Well, CMO 57, as I said, has a number of

13   different deadlines.  Many of them are 30-day deadlines that

14   kick off quickly, they trigger quickly.

15        **MR. KELLY:**  Right.

16        **THE COURT:**  And when that deadline runs for those

17   30-day requirements -- your deadline actually passed on

18   February 21st -- there is a cure period, c-u-r-e, a cure period

19   in which 3M would notify the plaintiff -- in your case, you and

20   Mr. Aylstock -- of what they perceive -- "they" being 3M --

21   perceive as deficiencies with those deadlines, whether you just

22   completely missed a deadline or whether you maybe complied but

23   only partially with a deadline.

24        And so 3M then issues notice to you and your counsel

25   about those deficiencies, and then you have 30 days of what we

1   call a cure period to correct those deficiencies.

2           And I believe, as Mr. Beall just indicated, they

3   notified you of deficiencies on March 8th, and so you have a

4   cure deadline for those deficiencies of April 8th.

5           **MR. KELLY:**  Your Honor, I hadn't -- nobody has told me

6   anything about being deficient.

7           **THE COURT:**  Well, it's in the order, sir.

8           **MR. KELLY:**  What order?

9           **THE COURT:**  My order.  It's in CMO 57.  It spells this

10  out.

11          **MR. BEALL:**  I'd be happy to -- I've got an extra copy

12  of the deficiency if I could just hand it to him.

13          **THE COURT:**  Okay, that'll be fine.  The letter was

14  just sent, but, yes, that's fine.

15          But again, something I should stress, since you still

16  have counsel, Mr. Beall's obligation is to serve that on your

17  counsel, not you.  If you're *pro se*, that's different.  Then

18  his obligation is to serve you individually.

19          But as long as Mr. Aylstock is your attorney, he's

20  your agent, and that's who -- lawyers talk to lawyers, if

21  you're represented.  That's an ethical rule.

22          There was also, as part of CMO 57, a requirement for

23  an affidavit to be submitted regarding the statute of

24  limitations.  I believe that's been submitted.  Mr. Aylstock

25  has done that.

1          What I have told other plaintiffs is that it's a

2     possibility that one of the first things that will happen, if

3     your case is not settled, is that I will set a short time frame

4     for you to be deposed.  And it would be strictly limited --

5     this deposition would be strictly limited to the issue of

6     statute of limitations, nothing else about your claims or

7     damages or anything like that, but just the statute of

8     limitations.

9          And then 3M would have an opportunity for an early

10    dispositive motion or summary judgment motion -- frankly, you

11    could file one as well -- in which the matter will be presented

12    to me for me to decide whether there is an issue of fact for a

13    jury regarding the statute of limitations.

14         If there is not, then your case would be dismissed on

15    that basis.  If there is, then I would find that question of

16    fact, and I would put that into my order, and then that's

17    something a jury would determine if your case goes to trial.

18         There are also 60-day deadlines in my CMO 57 order

19    that has been issued to you for expert reports.  I'm sure that

20    you're aware of this.  I feel certain Mr. Aylstock has talked

21    to you about this.  Your 60-day deadline is March 22nd.  That

22    deadline, too, is subject to a cure period of 30 days.

23         So, depending on when 3M -- let's just say they issue

24    you a deficiency notice.  I don't know that they will.  Maybe

25    you have your experts lined up, you're ready to issue your

1    reports timely.  If that's the case, there won't be a

2    deficiency.  If there is, then that also would trigger a 30-day

3    cure period.  Again, just making sure that you understand what

4    will happen going forward.

5            Now, the other thing, before I get into experts, I

6    just want to make sure that you know how many -- I feel

7    certain, because of Mr. Aylstock being your lawyer, you know

8    what the participation rate is right now with the settlement.

9    It is extraordinary.

10           I keep talking about how extraordinary this litigation

11   is.  Some of it is extraordinary in a way that may seem a

12   negative because it's been a toll and a strain because of some

13   of the challenges that we face because of the size of it.  But

14   this reference to extraordinary is a very positive.

15           And what I'm referring to is there were just over

16   300,000 plaintiffs that appeared on a declaration form on the

17   date of September 12th, 2023, which was the reference date.

18   And if you didn't appear on a declaration form, then you were

19   out.  And that certainly happened.  But you did, fortunately

20   you were on a declaration form, and so were just over 300,000

21   other people.

22           And then we went forward with registration, as you

23   know.  And after all of that dust settled in terms of who

24   timely registered, who didn't, there are over 250,000 claimants

25   or plaintiffs who registered.  And out of those 250,000 that

1    registered, under 20 of them have opted out of the litigation.

2    So, out of over 250,000 people, only 20 have elected not to

3    participate and have decided to go forward, and those are the

4    people I've been meeting with over the last couple of weeks.

5         So, if you haven't had this discussion with

6    Mr. Aylstock, I'd be surprised, because he knows it so well.

7    But if not, I'm sure you will have this discussion about how

8    expensive the experts are in this litigation.

9         And we've seen it -- I'll just tell you, again, he

10   knows this because he's lived it.  Other lawyers in the

11   courtroom know it, certainly from the plaintiffs' perspective.

12   I don't know it from 3M's perspective in terms of what they

13   spent.  I know what the plaintiffs spent on experts per

14   bellwether trial, and it was over $200,000 per trial for

15   experts.  And there's not just one expert.

16        And they come with a stable of experts, "they" meaning

17   3M.  And you have to meet that head on, and you have what we

18   call a battle of the experts.  There are experts in audiology,

19   there are experts in ENT and neurotology, which you probably

20   know about what a neurotologist is, a surgeon who operates in

21   the ear.  And then there were ballistics experts, there were

22   acoustical engineering experts, and even government contracting

23   experts.

24        And I have no doubt, if your case proceeds to trial,

25   you'll need all of those experts.

1          The military contracting expert is an interesting one.

2     In the bellwether trials, the plaintiffs had a military

3     contracting expert.  The defense did not.  But I suspect in

4     trials going forward, that will not be the case.  I suspect 3M

5     will have a contracting expert.

6          And you've probably heard about the government

7     contractor defense.  You know what I'm talking --

8          **MR. KELLY:**  Uh-huh.

9          **THE COURT:**  So it's important for you to keep in mind,

10    in terms of having opened eyes and appreciating the challenges

11    you'll face going forward, no matter how strongly you believe

12    in your case, that issue is still a live issue for cases that

13    go forward.  Because, although the parties had the benefit of

14    my ruling, it was appealed, that ruling was appealed as part of

15    every bellwether judgment that was appealed, and the Eleventh

16    Circuit did not rule on that issue, they did not decide whether

17    I was correct as a matter of law or incorrect with my decision

18    because the case -- the litigation settled before that decision

19    was made.  And so there's been no final decision on appeal

20    regarding whether I was right or wrong about that.

21         Best case scenario for 3M -- say your case -- I'll

22    just use you since you're here -- goes to trial, you prevail.

23    They will appeal.  There's no question about that, they will

24    appeal.  And on appeal they will raise again the government

25    contractor defense, which they are entirely within their right

1   to do.

2           And one of three things can happen.  One is I get

3   affirmed, my ruling gets affirmed in its entirely.  Second,

4   they decide that I erred in granting judgment as a matter of

5   law for the plaintiffs, which is what I did, and they say, no,

6   Judge Rodgers, you erred, there's a question of fact for a jury

7   here, and they send the case back for a retrial and a jury

8   decision on that issue.

9           And that's why I say government contracting experts

10  may become very, very relevant in the future, if there are

11  future cases in this litigation.

12          The third thing that can happen, which would be a big

13  win for 3M, is that the Eleventh Circuit decides, Judge

14  Rodgers, you got it really wrong, not only did you err in

15  entering judgment for the plaintiffs, we agree with you there's

16  no question of fact, but we believe that there's no question of

17  fact and the ruling, as a matter of law, should be in favor of

18  the defense, and they are entitled to step into the shoes of

19  the United States military because of their involvement in the

20  design of the earplug.

21          That could happen.  And if that happens, game over for

22  -- not for the settlement.  The people who have settled, that

23  ruling would not affect those people.  So they wouldn't have to

24  give their money back or anything like that.  But it would 100

25  percent affect any cases -- live cases moving forward.

1          So, please, do keep that in mind.  Because I had

2    countless discussions with plaintiffs' lawyers about that

3    decision and trying to get through to them that they needed to

4    think about the risks of that in terms of their settlement

5    perspective that that was a very real risk that that could

6    happen.

7          And if the Eleventh Circuit decided that I got it

8    really wrong, game would have been over for everybody,

9    including the bellwether verdicts and punitive damages and all

10   of that would have been out the window.

11         So I don't have any doubt, Mr. Kelly, that you've

12   suffered a great deal.  I've looked at some of your records.

13   Again, I've sat through -- I presided over six of the

14   bellwether trials.  I covered for two judges in two of the

15   other trials, and I listened to every single trial via Zoom,

16   sometimes more than one at once, from day one to the end.  And

17   so I know the records very well of every single trial.

18         And I know that plaintiffs have suffered.  And I know

19   that plaintiffs are all very good witnesses.  They -- all of

20   them made excellent witnesses, they were personable, they

21   served our country, and every single juror in every trial

22   appreciated them for their service, 3M appreciated their

23   service.  And that rang loudly throughout the trials.

24         And every single one of them believed strongly in

25   their case, and they believed strongly that the earplug was

1    defective.  3M did not agree with that and still doesn't.  They

2    believed strongly that the plug was defective, and they

3    believed strongly that the defect in the plug was responsible

4    for their suffering.  No doubt about that.

5         And throughout those trials, all of those plaintiffs

6    had the opportunity because they were randomly selected -- this

7    really was a random process.  But their number was called, so

8    their case got tried.  And 13 of them prevailed and six of them

9    did not.

10        And the six that did not prevail, it wasn't because

11   they believed less strongly in their case, it wasn't because

12   they were not as damaged as the 13 who did prevail.

13        And I'm looking at Mr. Monsour because I know that he

14   had one of the clients that stands out most in my memory as far

15   as the bellwether trials because the case could not have been

16   tried any better, and Mr. Monsour could not have had a more

17   likeable, personable client as a plaintiff, nor could he have

18   had a client who had a record of more brave service than that

19   individual had.  And he lost.

20        And he lost at the hands of a jury that wanted to give

21   him money, lots of money.  But the jurors followed the jury

22   instructions, and, under the law, they could not find that Mr.

23   -- Mr. McCombs was his name -- they could not find that he had

24   proven, in spite of tinnitus, in spite of hearing loss, that he

25   had proven that he suffered those injuries at the time he was

1    wearing the earplug and was exposed to noise.

2         I'm a veteran of the Army.  Maybe you know that.  I

3    know how much noise there is in the military, particularly the

4    Army.  There is a lot of noise and there is a lot of noise all

5    of the time.

6         I was not in -- I mean, thankfully, I was not in Iraq,

7    I was not in Afghanistan.  Many of these soldiers were,

8    yourself included.  Lots and lots of noise in those venues.

9    For some of these juries it was just -- it was too difficult

10   for them to get over the causation sort of hurdle that they

11   have to get over to find that the plaintiff had proven his

12   case.

13        And Mr. McCombs was only one.  There were five others

14   just as devastated.  Cases very well tried, good, likeable

15   people with injuries, wore the plug.  Because it's not enough

16   to prove that the plug was defective, you know that.

17        **MR. KELLY:**  Right.

18        **THE COURT:**  And even then, you have to prove it again.

19   No one will ever stand in this courtroom or any other courtroom

20   in the country and argue to a jury that they should find that

21   the plug is defective because 13 other juries found it

22   defective.  That will never, ever, ever be heard inside of any

23   courtroom.  But that's still not enough.

24        And so there are also, in addition to the 13 -- excuse

25   me, the six who lost -- Mr. Beall will I think probably mention

1      this in a minute -- but there were others who were in the

2      bellwether process, had been selected for bellwether trials,

3      whose cases were dismissed before they ever got to trial, for

4      whatever the reasons were by those attorneys for dismissing

5      those cases.  My guess is they realized they couldn't prove

6      their client's case, and so those cases got dismissed.

7              So it's really more than just six that didn't prevail

8      as far as the bellwethers.

9              The last thing I'm going to talk to you about, and

10     then I'm going to stop talking, are your records, the ones that

11     I'm familiar with.  I haven't seen every, I'm sure, one of your

12     records.  But I have looked at your DOEHRS data.  And an expert

13     audiologist who is working with us in the settlement program --

14     maybe you know Dr. Spankovich or you've heard of him.

15             **MR. KELLY:**  No.

16             **THE COURT:**  No?  Well, anyway, I've had him look at

17     the DOEHRS data, and you have some challenges going forward.  I

18     don't doubt that you have hearing loss and tinnitus, for sure.

19     But before you ever -- and I'm just basing this on the records,

20     okay?  We haven't met, I've never talked to you.  I don't know

21     -- this is not a credibility determination.

22             This is objective data that you will have to contend

23     with, because these people, 3M, will absolutely be hanging

24     their hat on some of this.  But you actually had evidence of

25     hearing loss before you ever wore the CAEv2.  You had a

1    September 2002 audiogram, mild hearing loss in the left ear at

2    6000 hertz, slight hearing loss in the right ear at 6000 hertz,

3    again, before your use of the CAEv2, which was in, I believe,

4    started in '04 or '05.

5            One thing that's interesting about your records, and,

6    I don't know, maybe you have an answer for this.  You have a

7    medical record from December of 2008 that shows your physical

8    sort of health profile as an H3.

9            Did you know that?

10           **MR. KELLY:**  *(Indicating negatively.)*

11           **THE COURT:**  Well, that's an indication that you have

12   hearing impairment.  That's the highest sort of -- I'll call it

13   an impairment rating.  That's really not what it's called.  But

14   it's a designation that the military gives to individuals when

15   they have hearing problems.

16           There's no corresponding audiogram, though, for that

17   rating.  So I don't know where -- there should be a 2008

18   audiogram.  It's not in your DOEHRS data.  Maybe you have it,

19   but the DoD didn't have it.  If you do have it, you should let

20   Mr. Aylstock know.  There is one from 2009, but that's after

21   this.

22           **MR. KELLY:**  I was -- at the same time I was going

23   through MEBs.  Fort Bragg should have something.

24           **THE COURT:**  I don't know.  But there's no way that --

25   I don't know whether Fort Bragg has it or not.  That would be

1   something that you'd have to look into.  I don't know.  The DoD

2   did not have it.

3          But if you -- you know, perhaps it could be helpful to

4   you if you had a 2008 audiogram -- let's just say you had one

5   in your back pocket -- that would be -- that could be helpful

6   for you in the settlement program for sure.  And it would be

7   something you would probably need if you were going to continue

8   litigating for sure.

9          The other thing -- and this is an issue -- these

10  lawyers here in the courtroom can tell you this, they will

11  vouch for what I'm about to say because they lived it.  But

12  concurrent with your use of the Combat Arms Earplug, you

13  suffered a head injury due to an IED explosion while you were

14  serving in Iraq.

15         And I'm sorry about that.  I've heard descriptions of

16  that from other plaintiffs in their trials, and it's tragic.

17  It should not have happened.  I'm sorry to hear that it

18  happened to you.  But there is -- in your records there is

19  indication of a traumatic brain injury, or TBI, from that

20  explosion.

21         And again, I know from the other trial records that is

22  something you'll have to contend with, because TBI can and does

23  cause tinnitus.  I'm not saying that that's what happened in

24  your case.  But I can promise you 3M will say that that's what

25  happened in your case.

1           And I'm not here to make any -- again, there's no

2    findings, there's no credibility determinations.  This is just

3    something you and Mr. Aylstock need to be aware of or certainly

4    you need to be aware of if he's allowed to withdraw.

5           Interesting that your VA application for service

6    connection for hearing loss was denied in 2006 because you

7    later had that H3 rating.  And so this is -- I'm just saying

8    this is a surprise to me.  And it may be that, if you have that

9    audiogram or even if you don't -- and this has nothing to do

10   with your case.  I'm just telling you this as a person.

11   Because you had that H3 designation, I don't know whether you

12   can reapply to the VA for -- what's that?

13        **MR. KELLY:**  The reason being, I had a Christian group

14   help me do my packet, and I actually went to an audiologist,

15   and my tinnitus was so bad that day she couldn't get an

16   accurate measurement.  They were supposed to refile that and

17   reschedule my appointment.  I never heard anything else.  But

18   they did deny it and they denied just about all my claims.

19          And then we -- I had to -- thought we could appeal it.

20   I had to appeal it.  And they said they wouldn't recommend

21   appealing everything because it wouldn't look good on your

22   record, so they just said let's just leave this one out, and

23   this is exactly what happened.

24        **THE COURT:**  Well, you did receive a rating for

25   tinnitus.  I guess what I'm saying is, if there is some

1    document that you didn't have back at the time of your initial

2    application for benefits that you now have or if there's

3    something that the VA did not consider because you didn't have

4    it, it had been lost, or maybe it's at Fort Bragg, I don't

5    know.  And I don't know enough about the VA process to know

6    whether you still have time to do this, but it might be

7    something you want to look into.

8    **MR. KELLY:**  It should have come with the archive

9    record because it comes with the C&P exams.

10    **THE COURT:**  Well, I can tell you the archive records

11    doesn't include everything.

12    **MR. KELLY:**  I just got an email from the archives

13    office.

14    **THE COURT:**  Okay.  Well, maybe it's there.  And if it

15    is and there's a 2008 audiogram that corresponds with the H3

16    finding, I suggest you ask Mr. Aylstock about it.  And

17    hopefully you can do that before I issue my ruling because I

18    don't know what I'm going to do, and if he's allowed to

19    withdraw, I don't know that he'll be able to help you.

20    And I'm not indicating to you what my ruling is going

21    to be.  But if you have those documents, I'd get them to him

22    now, is my point.

23    **MR. KELLY:**  Somebody has got them somewhere.

24    **THE COURT:**  The other thing I would mention and would

25    be remiss if I didn't, Mr. Kelly, is that there is a record in

1     July of 2019 where you denied experiencing either hearing loss
2     or tinnitus.

3           I'm not saying that you weren't experiencing it.  We
4     saw all kinds of records and comments in records throughout the
5     trials.  But it's in there.  And again, in terms of things
6     you'll have to contend with from 3M, that's one of them.

7           You may have an explanation for it, and it's fine.  I
8     really -- it's not that I don't want to hear it.  It just won't
9     matter here.  You may have an explanation.  And, again, I'm not
10    here to make any credibility determinations at all.

11          And then I'm not here to tell you you're not going to
12    win your case if you make it to trial.  It's just it's going to
13    be difficult to get to trial.  But if you do, I'm not here to
14    tell you that you won't prevail.

15          I am here to tell you it's going to cost you a lot of
16    money, there's no doubt about that.  There are going to be
17    challenges along the way from these folks over on the other
18    side of the courtroom, the other side of the v.  And after all
19    of those challenges, even if you meet them, you may lose.  And
20    Mr. Monsour can tell you that.

21          I mean, it is -- when I say these folks were
22    devastated, that's an understatement.  And again, all of them
23    wanted their day in court, and they got it.  Again, luck of the
24    draw for them, I suppose, in some respects.  They got their day
25    in court as far as a trial.

1           I know they all wanted and they were seeking

2  vindication.  I don't know that having a jury tell Mr. McCombs

3  that his problems were not as a result of a defective earplug

4  that he believed was defective and caused his problems made him

5  feel any better about his situation.  I suspect not,

6  unfortunately.  But that is what happens.

7           And again, the jury follows the law, and sometimes

8  it's a win for the plaintiffs and sometimes it's a win for the

9  defense.

10           So what I'm going to do now, Mr. Kelly, is I'm going

11  to see if, from a leadership perspective, if there's anything

12  Mr. Aylstock wants to say.  So this is not as your counsel --

13  or Mr. Bradford or Mr. Monsour or Mr. Burns, not all of them.

14  You guys have talked longer than I have.

15           But if one of you does want to speak on behalf of

16  leadership as opposed to Mr. Aylstock, since he has this dual

17  role here, that's fine.  And then I'm going to let Mr. Beall

18  speak for just a moment, and then I'm going to ask you if you

19  have any questions of me.

20           **MR. MONSOUR:**  Can I approach?

21           **THE COURT:**  Certainly.  It's nice to see you again.

22           **MR. MONSOUR:**  Thank you, Your Honor.  Nice to be here,

23  nice to see you.

24           Since you brought it up, if you would be so willing,

25  Dustin McCombs would probably love to opt into the settlement

1    now, if you could figure out a way to do that.

2           **THE COURT:**  Well, you know what, if I was my

3    settlement, I would allow it.  But unfortunately, it's not my

4    settlement.  It's these guys' settlement.

5           **MR. MONSOUR:**  One of the things, Judge, if I could, I

6    would like to ask the Court for a favor.

7           I met Mr. Kelly just when I walked up this morning.

8    And I know you had asked if I had talked to him and -- I would

9    like a chance to sit down and talk with him about his case.

10   Maybe he could hear about some of the issues from litigation

11   from a lawyer that has tried cases in this very courtroom and

12   lost.  But I've won in other courtrooms.  And maybe talk to him

13   about the merits of his case.

14          There were a couple of things that you mentioned that

15   kind of perked my ears up when talking about the merits of his

16   case, and so I'd like to flesh some of that out with him.  Some

17   of them seemed to be big issues, some didn't seem to be as big,

18   but some of them kind of -- they definitely perked my ears up.

19          So, if I could at some point in time this afternoon,

20   I'd love to sit down and talk with Mr. Kelly about his case.

21   Because if he's got a sure fire loser, I want to tell him.  And

22   if his case is more of a varying quality, I would like to -- if

23   there's one thing I know, it's bad 3M cases.  And you can ask

24   anybody in this courtroom, I know bad ones as good as anybody.

25          So I would like to talk with him about some of those

```
 1   things and see -- kind of find out a little more about him, a
 2   little more about his case, a little bit more about him.
 3            THE COURT:  Well, point out the pluses, too.
 4            MR. MONSOUR:  Oh, absolutely.
 5            THE COURT:  I pointed out to him things that I know 3M
 6   will make a mountain out of.  Even if you guys think it's a
 7   molehill, they will make a mountain out of it, because I've
 8   seen it and you've seen it.
 9            MR. MONSOUR:  Yes, I know.  That's why I wanted to
10   talk to him a little bit more.  And he said he had some
11   records, and I'll gladly look through anything he has.
12            THE COURT:  If he's willing.  I mean, it's really his
13   decision.
14            MR. MONSOUR:  I'll do some homework.  But I flew in to
15   talk to him, and I'm more than happy to talk to him, I would
16   love to sit down and talk to him and go through the entire
17   merits of his case and see kind of what I think about it.  I'm
18   more than happy to do that from leadership perspective that is
19   not with the AWKO law firm.
20            THE COURT:  Well, if he's willing to do that, and AWKO
21   is willing to allow you to do that, since they still represent
22   him, that's up to you all.  You can talk about that.
23            I can't think of -- really, aside from your own
24   lawyer, I can't think of a better lawyer for you to talk to,
25   because Mr. Monsour has been in the trenches, he's won some and
```

1    he's lost some.  And so he's about as good as anybody.  And he

2    doesn't have any interest in your case, whereas Mr. Aylstock --

3    you know, I don't mean to be critical here, but you do, you

4    have an interest in his case, whereas Mr. Monsour really

5    doesn't.

6              And it doesn't cost you anything.  Mr. Monsour is

7    here.  And if you'd like to talk with him, I think that's not a

8    bad idea.  But, again, you two have to be willing to let that

9    happen.

10             **MR. AYLSTOCK:**  We're happy to allow that.  And I think

11   Mr. Kelly is willing to do that as well.

12             So, thank you, Mr. Monsour.

13             **THE COURT:**  Well, I'm certainly in favor of it, if you

14   all are willing to do it.

15             Thank you, Mr. Monsour.  Good, again, to see you.

16             Mr. Beall, I'm going to let you speak for 3M.

17             **MR. BEALL:**  I'll be happy to.  And I'll speak over

18   here, if that's okay with you.

19             **THE COURT:**  That's fine.

20             **MR. BEALL:**  Just briefly, I appreciate you coming

21   here, and I appreciate your service.  And I actually want to

22   say I do concur, you meeting with Mr. Monsour would be a great

23   idea.  I think I tried I think three cases against him at

24   least.  It seemed like 20, but it was, I think, only three.

25   But anyway, he knows these cases.

1          I know you feel strongly about your case or you

2    wouldn't be here.  But, just as Judge Rodgers pointed out, 3M

3    feels just as strongly on the other side.  And not only do we

4    feel like it would be hard for you to get to trial and also to

5    prove your case, but we do not believe this plug was defective

6    to this day.  And during the trials, we put on evidence from

7    highly trained to highly accomplished acoustical people about

8    that and also some military documents and records that showed

9    the military tested it and liked the plug.

10         So you're going to have prove that the plug was

11   defective before you even get to the fact of proving the

12   causation.  And that's why -- you know, 3M did not settle

13   because we said we can't win this.  We settled because it was a

14   business decision, as you, I think, understand.  When you're

15   dealing with 300,000 lawsuits, you have business decisions to

16   make.

17         The settlement that we reached with the plaintiffs'

18   leadership was based on a structure that includes an

19   independent medical evaluation of any claims remaining in

20   litigation, including yours, which is why Judge Rodgers has

21   your records, we have your records.  We can look at them, we

22   have independent experts looking at them to see, you know, how

23   viable your case is.

24         That structure was supported by the plaintiffs'

25   leadership, it was supported by people like Mr. Monsour and

1    others who were the people who tried the cases, and also by the

2    Court itself.

3          We do recognize that some people may decide to

4    challenge it and to litigate their cases and to opt out of the

5    settlement.  But we will, obviously, ask the Court to enforce

6    strictly the requirements of her orders, including CMO 57.  And

7    thus far, the Court has done that, and we expect her to

8    continue to do that.

9          We, obviously, tried 16 cases, as Judge Rodgers said.

10   That is an extraordinary number of cases.  Because of that, we

11   have the trial -- we're ready to go, basically, but for looking

12   at your specific case.  We've got our experts lined up, we've

13   got the evidence of the witnesses.  And once we have sort of

14   pored through your records with our experts, we can try these

15   cases, and it wouldn't be problem for us to do that.

16          And if we do try the case and we were to lose the

17   case, we will, in fact, appeal.  I can assure you of that with

18   about 100 percent certainty, because we've appealed every other

19   case, including on the government contractor issue that the

20   Court mentioned earlier, which could completely end the case.

21          Judge Rodgers pointed out that, prior to settlement,

22   we had 27 people selected for bellwether cases.  Six the

23   plaintiffs lost at trial, another, I believe, 14 -- another

24   eight of them dismissed their cases.  So what that meant, of

25   the 27, over half -- 14 -- recovered nothing.

1           And I know that the CMO has a mediation requirement.

2    We will obviously participate in good faith in that mediation.

3    But we want you to understand that we don't view that as an

4    opportunity for 3M to throw more money towards you to sweeten

5    the deal.  The settlement is what the settlement is, and that's

6    the way we're going to approach those mediations.

7           So, with that said, we would -- hopefully, after you

8    confer with Mr. Monsour and Mr. Aylstock, you will perhaps opt

9    into the settlement, which we think is fine.  If not, just be

10   prepared that we will be contesting the claim strongly.

11          Thank you, Your Honor.

12          **THE COURT:**  Thank you, Mr. Beall.

13          Mr. Kelly, is there anything that you would like to

14   ask me or any questions?  I'm here.  I certainly can't advise

15   you.  You don't need that; you have a lawyer.  But I'm

16   certainly here to answer any questions, if you have any.

17          **MR. KELLY:**  I don't think so, Your Honor.  I

18   appreciate it.

19          **THE COURT:**  Mr. Kelly, again, my point here is not to,

20   you know, to be critical or to try to twist your arm.  It

21   really isn't.  It is more of an opportunity for me and you to

22   meet and then also for me to express to you what I know to be

23   the challenges, so that, if I end up having to dismiss your

24   case -- I hope not, but if I do -- and I've dismissed over

25   100,000 cases in this litigation, and so I won't hesitate.

1    Because I am an equal opportunity judge, and if I've dismissed

2    100,000, I'll dismiss another one.  And if I have to do that, I

3    want you to know why.  And that's why I was talking to you

4    about the hurdles of CMO 57.

5           But if you feel strongly and you want to move forward,

6    that's your right.  That's what this courtroom is designed for,

7    we hear cases and trials, and that's what the court system

8    does.  And so that's -- whether it's this Court or a different

9    court, if your case gets to trial down the road -- it will be

10   some time, I have no doubt.

11          But if your case does get to trial, then I wish you

12   all the luck in the world.  I just, again, eyes wide open that

13   you may end up with nothing.

14          And one thing we didn't discuss, I should just mention

15   it briefly -- sorry, everybody -- is the bankruptcy.  I know

16   you're aware of the Aearo bankruptcy, and that had its own

17   trials and tribulations.  But that was Aearo.  And there's

18   nothing that says Aearo can't try it again, and there's nothing

19   that says 3M can't file for bankruptcy.

20          If that happens and your case is a live case, I

21   haven't even thought all of this through yet, what that would

22   do for the settlement people.  My guess is they would be ahead

23   of you in terms of priority for -- whoever hadn't been paid

24   would be ahead of you in terms of priority.  But everything

25   changes in a bankruptcy.

1          For instance, in a bankruptcy, if this had gone

2   forward and 3M had been able to get the protection it was

3   trying to get in bankruptcy, you may not have been able to opt

4   out.  And there wasn't nearly the money in the pot in

5   bankruptcy or projected in bankruptcy than 3M ended up agreeing

6   to pay here.  Frankly, not even close.

7          But what happens in bankruptcy is, if there's enough

8   people that agree to it, then people like you are stuck, at

9   least for now, unless the Supreme Court rules otherwise.  But

10  for now that's the law.

11         I hope that doesn't happen.  I'm not telling you that

12  I think it's going to happen.  But they have other legal

13  liabilities that they're facing and having to deal with from a

14  business standpoint, and it certainly is possible.  I hope not,

15  but it's possible, so you need to keep that in mind in the

16  equation as well, I guess.

17         But good luck to you.

18         Mr. Kelly, I'm going to ask also that you -- I

19  mentioned this earlier -- you speak to Judge Cannon, who has

20  now come into the courtroom.  This is Judge Hope Cannon.

21         This is Mr. Kelly.

22         And as I said, Judge Cannon is very, very familiar

23  with the settlement program, and she'll be able to answer any

24  questions that you may have about it.

25         **MR. KELLY:**  Thank you.

1    **THE COURT:**  Mr. Kelly, thank you again for coming.  It

2    was very nice to meet you.  And thank you also for your

3    service.

4    Counsel, thank you for being here.  And let me know if

5    you all need anything.

6    We'll be in recess.

7    *(Proceedings concluded at 3:36 p.m.)*

8    --------------------

9    *I certify that the foregoing is a correct transcript from the*

     *record of proceedings in the above-entitled matter.  Any*

10   *redaction of personal data identifiers pursuant to the Judicial*

     *Conference Policy on Privacy are noted within the transcript.*

11

12

     *s/Donna L. Boland*                          *5-21-2024*

13   *Donna L. Boland, RPR, FCRR*                 *Date*

     *Official Court Reporter*

14

15

16

17

18

19

20

21

22

23

24

25